UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:18-20823-CR-KMW

UNITED STATES OF AMERICA,
        Plaintiff,

vs.

MARK FISHER,
        Defendant,
_____/

SENTENCING MEMORANDUM
ON BEHALF OF MARK FISHER

Mark Fisher (herein after referred to as "Mark") by and through his undersigned counsel, Jason W. Kreiss, Esq.,  and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth and Sixth  Amendments  to the *United States Constitution*, respectfully files this sentencing memorandum and request for a variance below the advisory guidelines to aid the Court in determining a reasonable sentence that is sufficient but not greater than necessary.

**INTRODUCTION**

Mark Fisher entered a guilty plea to a one count information charging him with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. A sentence below the advisory sentencing guidelines would comply with 18 U.S.C. § 3553(a)(1-6) based upon the following reasons:

-Mark Fisher has demonstrated extraordinary acceptance of responsibility by entering a

1

timely guilty plea and agreeing to voluntarily disgorge not only the proceeds from the charged conduct but additional transactions that he voluntarily disclosed to the government in the course of his cooperation;

-Mark Fisher has strong family ties and family responsibilities based on the needs of his wife and children;

-Mark Fisher has cooperated with the government by providing extremely valuable information in an attempt to provide substantial assistance;

-Mark Fisher has a history of charitable contributions and community involvement;

-Mark Fisher's likelihood of recidivism is substantially diminished based upon his age and significant medical and mental health issues.

## GUIDELINE / PROCEDURAL ISSUES

Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three-step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007, *U.S. v. Pugh*, 515 F. 3d 1179 (11th Cir. 2008) and Amendment 741 of the Sentencing Guidelines, effective November 1, 2010.   First, the Court is to resolve any disputed guideline issues and determine the *advisory* guideline range.  Pursuant to paragraph 13 of the written Plea Agreement, the parties agree that U.S.S.G. § 2B1.1 applies, and the total offense level is 23 after a 3-level reduction for Mark's acceptance of responsibility.   As a first-time offender, the *advisory* guideline range in this case is 46 to 57 months and, because the PSR is consistent with the agreement between the parties, there are no legal or factual objections.

Second, the Court is to consider if there are any factors that may warrant a departure

from the *advisory* guideline range. The PSR does not identify any factors that may warrant a downward departure.  Although we believe additional factors for departure exist, we will offer them as sentencing factors for a variance pursuant to 18 U.S.C. § 3553.

Lastly, the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is *reasonable and not greater than necessary* to achieve the sentencing objectives set forth in 18 USC § 3553(a).  We believe there are factors worthy of this Court's consideration.

**REQUEST FOR VARIANCE**

The *advisory* guideline range in this case is 46 to 57 months.  Although we are not seeking any Chapter Five downward departures, courts are now free from the mandatory nature of the Federal Sentencing Guidelines, *U.S. v. Booker,* 543 U.S. 220 (2005).  Subsequent to *Booker,  Gall v. United States,* 128 S. Ct. 586, and *Kimbrough v. United States,* 128 S. Ct. 558, both decided on December 10, 2007, and *U.S. v. McBride*, 511 F. 3D 1293 (11TH Cir. 2007), made clear  that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 U.S.C. § 3553 factors, and any attempt to give special weight to the sentencing guidelines is contrary to *Booker*.  The Supreme Court went even further in its decision in *Nelson v. United States,* 129 S. Ct. 890 (2009), where the court reiterated its rationale  in *Rita v. United States,* 551 U.S. 338 (2007), that a sentencing court may not presume that a sentence within the applicable guideline range is reasonable and added "the Guidelines are not only *not mandatory* on sentencing courts, they are also not to be *presumed reasonable."*

**HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

<u>Personal Background</u>

Mark Fisher will stand before the court for sentencing having accepted responsibility for his actions with 0 criminal history points. Mark is 54 years old and has been residing in South Florida for over 20 years.  Mark is the son of David and Rita Felstein and the brother of John and Joel Felstein.[1]   Unfortunately, both of Mark's brothers suffered from severe addictions and died of overdoses at the ages of 26 and 39.  Mark's father with whom he had a good relationship with is also deceased.  Mark has been married to his wife Doris for the past ten years and the couple have 2 children, eleven-year old Jack and eight-year old Madison, both of whom have significant medical issues.

Mark grew up in an extremely dysfunctional family.  His parents divorced when he was 9 or 10 years old after a bitter battle over money and child custody that lasted for years.  Mark's formative years were anything but "normal".  In a letter to the Court, Bridgette R. Roepke, Mark's father's girlfriend of more than 40 years stated:

*The pressure of having divorced parents, a devoted father who wanted the best for his children and the none ending interference of a mostly absent mother- a terrible situation…Mark was very effected by the death of his siblings and the profound sadness and progressive illness of his father.*

Prior to attending Skidmore College, Mark attended almost a dozen different primary schools as his family was constantly moving around the country. His mother is described by Mark and others as unstable, selfish and "most likely manic-depressive."  Mark's brother, John

---

[1] Mark Fisher adopted his mother's maiden name and legally changed his name from Felstein to Fisher in Broward County on March 24, 2008.

began the first of several institutional stays at age 10, and John and Joel frequently ran away from the family home together.   Mark and his brothers all developed serious substance abuse issues as teenagers.  Despite the dysfunctionality of his family during his formative years, Mark always excelled in school.  In 1986 Mark obtained a bachelor of arts degree from Skidmore College in Saratoga Springs, New York.  After graduating from Skidmore Mark attended and graduated from Thomas Cooley Law School in Lansing Michigan and became a member of the New York and Florida Bars.

Extraordinary Family Ties and Responsibilities

Mark's wife, Doris, is a U.S. resident and a native of Honduras.  She has a high school education, minimal employment skills, and very little work history.   Doris' lack of comprehension / language barrier issues along with a significant hearing deficit greatly diminish her ability to communicate effectively, and therefore she and the children are greatly dependent on Mark's emotional and financial support.[2]

Michael Fisher, Mark's uncle writes:

*In regards to accomplishments, Mark's biggest and best accomplishments have to do with his wife and of course his two most precious children. I've never encountered a more involved and loving relationship than the one that Mark has with his-children. He makes sure that their smallest of needs are his priorities. He is proactive about everything that concerns them. Every ballet or baseball practice, game, school event, soccer game, basketball game etc., Mark & Doris are present...*

*Mark Fisher is one of the best parents I have seen in my life. I wish that I had been as thorough and as thoughtful as Mark is. He is the parent that keeps the family functioning on an even keel. He is the head, the disciplinarian, the foundation that makes it all work. That is Mark Fisher's*

---

[2] A March 2, 2018 CT scan of Temporal Bones and hearing test show bilateral undeveloped mastoids and conductive hearing loss in middle right and left ear.  Dr. Joshua Weiss recommended exploratory surgery on March 12, 2018.  She is scheduled for a follow-up appointment in December.

*greatest and most important accomplishment. He is the family axle, it all revolves around him.*

In his letter to the Court, Jose Luis Amaya Funez, Mark's step-son states;

*I am very grateful to know Mark Fisher for many years, since 2006. He made it possible for me to have hope in my life and I see a bright future…My biological father never supported me emotionally or financially, but Mark has. Mark has pushed me to give me the confidence to succeed. I have a full time job, go to College, and have saved money and bought my own car. In fact it is my second car here. Mark gave me good advice on type of job to get and what to study in school. I never realized I was smart and could succeed…Mark always treated me with patience, respect and even though we did not speak the same language at first, we would use Google Translate for many years to communicate. He always made sure I was informed and most of all not forgotten in Honduras while he was trying to get my mother a green card, which he did in 2015.*

Family friend Lior Sebag writes:

*Mark is a family person and he is very close to his wife and his kids. Doris, Jack, and Madison depend on him every day. He is very involved with day to day task and in his kids' activities, taking his kids to kids' parties, on weekends making sure they have fun and as well making sure they are well behaved and manner. Aside from the tremendous emotional effects that this will affect Madison and Jack, the fact that he might be gone for a period of time it will be very difficult for his family to manage without him around.*

Jeff Koslow, another family friend commented:

*I find Mark to be exemplary father and a genuinely friendly and decent person. I've watched as he has formed a healthy bond with his kids. He has been an integral part of their life by providing guidance and support of a good father.*

Contemplating Mark's absence from the Fisher household has both Mark and wife extremely concerned. This issue is particularly germane in the Fisher household as both children have significant health problems requiring frequent medical support outside the home. Eleven-year-old Jack has had recurring middle ear issues requiring three sets of typanostomy tubes as well as two tonsillectomies and an adenoidectomy. Otolaryngologist Dr. David J. Kay wrote the following on July 27, 2018:

*I have treated Jack in our office on February 28, 2018. Jack has a history of middle ear issues which have required 3 sets of tympanostomy tubes, which fortunately appears to be stable based on his most recent visit with me.   I am now the fourth pediatric otolaryngologist who has had the pleasure of taking care of him.  He has previously undergone tympanostomy tube placements and tonsillectomy and adenoidectomy by Dr. Deborah Jaffe, tympanostomy tube placement and revision adenoidectomy by Dr. Steven Singer, and bilateral tympanostomy tube placement by my partner, Dr. David Mandel on September 24, 2014.   His parents are involved in his care.....*

Eight-year-old Madison is also treated by Dr. Kay and has undergone the same surgeries as her brother, beginning at age three.  She continues to have inner ear problems and was treated as late as July 2018 for a persistent ear canal infection.  Unfortunately, Madison was also diagnosed with Rolandic Epilepsy in December 2017 following multiple seizures and hospitalizations.[3]  Madison  has also been diagnosed with Attention Deficit Hyperactivity Disorder and is speech impaired.[4]   Madison's doctors struggle to manage her medication regiment as the medications for her illnesses have negative side effects on each other.  Madison regularly experiences emotional, behavioral and learning issues both at home and in school.  Madison is also undergoing a significant  orthodontic treatment, including the installation of an upper palatal expander to widen the upper arch of her mouth.[5]  Due to Doris' limitations, it will be extremely detrimental for the children for Mark to be absent from the family home for even the shortest amount of time as he is needed to attend the children's medical appointments and therapy sessions to effectively communicate and coordinate with the various specialists.  The children's medical records have been provided to the Probation Office.

---

[3] Madison's diagnosis of Rolandic Epilepsy was confirmed in medical records provided to probation; Dr. Roberto Tuchman, dated April 11, 2018.  Records also confirm she was prescribed Trileptal, 300 mg, twice day, as of September 25, 2018.

[4] Dr. Annette Santiago's letter, dated October 15, 2018, and School District of Palm Beach County, Department of Exceptional Student Education, report dated June 1, 2015.

[5] Dr. David Newman, DDS, August 29, 2018.

Effective October 27, 2003, the Sentencing Commission amended § 5H1.6 to limit the availability of departures for family ties and responsibilities.  The new application note, § 5H1.6, comment. (n.1(A)(i)-(iii), instructs the court to consider the seriousness of the offense, the defendant's involvement in that offense, and the members of the defendant's family.  Further, comment. (n.1(B)(i)-(iv) requires the court to consider if  "the defendant's service of a sentence within the guideline range will cause a substantial loss of essential care-taking  or essential financial support to his family,"   that   "the loss of care-taking or financial support exceeds the harm ordinarily incident to incarceration for a similarly situated defendant,"   that "the loss of care-taking or financial support is one in which no effective remedial or ameliorative programs reasonably are available,"   and that "the departure will effectively address the loss of care-taking or financial support."  Notwithstanding this pre *Booker* amendment, Mark Fisher asks this Court to consider his family ties and responsibilities as a § 3553 sentencing factor in fashioning a below-guideline sentence.  Although every child of an incarcerated parent suffers in the absence of that parent, in the instant case the children have significant medical issues that have been primarily dealt with by Mark due his wife's communication deficits.

Courts have addressed the issue of incarcerating the sole parent of very young children and much has been written on the subject.

• "Children with fathers who have been incarcerated are significantly more likely than other children to be expelled or suspended from school (23 % compared with 4 %).  Pew Charitable Trusts Report "Collateral Costs: Incarceration's Effect on Economic Mobility" (2010) at page 5.

• "Parental incarceration contributes to higher rates of delinquency, mental illness, and drug abuse, and reduces level of school success and later employment among their children." Unlocking America, Why and How to Reduce America's Prison Population (JFA Institute, November 2007) at page 32.

Courts have responded:

• *U.S. v. Hammond*, 37 F. Supp. 2d 204 (E.D.N.Y. 1999), "a sentence without a downward departure would contribute to the needless suffering of young, innocent children."

• *U.S. v. DeRoover*, 36 F. Supp. 2d 531, 532-33 (E.D.N.Y. 1999), "the unique dependence of children on a defendant is a basis for a downward departure."

• *U.S. v. Chambers*, 885 F. Supp. 12, 14 (D.D.C. 1995), "causing needless suffering of young, innocent children does not promote the ends of justice."

• *U.S. v. Johnson*, 964 F. 2d 124, 128-130 (2d Cir. 1992), "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."

Again, eight-year old Madison and ten-year old Jack have serious medical concerns and due to Doris' limitations, this family is extraordinarily dependent on Mark's presence and emotional support on a daily basis. Mark's extraordinary family responsibilities are a significant factor that should be taken into consideration

Extraordinary Acceptance of Responsibility

Mark's acceptance of responsibility, his willingness to cooperate with the government, and his profound remorse were all immediate in this case. When Mr. Fisher heard that the instant offense was being investigated by the SEC he immediately retained counsel and requested that

contact be established with the office of the United States Attorney and that it be communicated that he desired to cooperate and resolve his criminal liability. Without burdening the government with voluminous discovery submissions and judicial system with unnecessary litigation, Mr. Fisher executed a written plea agreement with a joint recommendation calculating the advisory guidelines, a detailed factual stipulation in addition to a voluntary forfeiture / disgorgement of illegal proceeds.  Mark agreed to return all ill-gotten gains related to the instant conduct in the information as well as additional transactions that he voluntarily disclosed to the government during the course of his cooperation. Mark has also cooperated with the Securities and Exchange Commission. In a parallel proceeding with the SEC, Mark entered into a consent judgment permanently barring him from participating in any offering, issuing, trading, or inducement in the offer or sale of any penny stock.  Although Mark took prior steps to relinquish his law licenses before he knew he was a target of this prosecution, he voluntarily agreed to a formal consent judgement surrendering his license to practice law in Florida and took similar steps in New York.

In compliance with the terms of the plea agreement, Mark agreed to make an initial payment of $6,000,000.00 prior to sentencing to be credited toward the entire forfeiture amount ordered at sentencing.[6]  Mark has tendered $6,000,000.00 to the United States Marshals Treasury account and furnished the government with a detailed analysis of his net profit and losses

---

[6]  Proof of a wire transmission to the United States Marshals account for $6,000,000.00 has been provided to the government.  In addition to fully satisfying all financial sanctions ordered in this case, Mark Fisher's 2017 individual tax returns reported he paid $2,161,427 in taxes from income that included capital gains realized from his participation in other securities transactions.

pertaining to the entities that he had involvement in.[7]   Mark has essentially done all he can to quickly and efficiently resolve his criminal liability, as well as to cooperate in the disgorgement of 100% of the ill-gotten gains, which is a rarity in South Florida fraud prosecutions.

Several courts have recognized that truly extraordinary efforts to make restitution may be a  permissible basis to depart downward.  In *United States v. Kim*, 364 F. 3d 1235 (11th Cir. 2004), the district court departed downward based on the defendants' efforts to pay their restitution obligation of $268,237.03 promptly.  The defendants tendered $50,000 on the day they pled guilty and paid the remaining balance at sentencing.  Although troubled by the post-indictment timing of the payments, the Eleventh Circuit nevertheless overruled the government's challenge and affirmed the sentence, stating,

*"We agree with the Government that the timing of Appellees' payment - specifically, their failure to pay restitution before criminal indictment, and only pursuant to a negotiated plea agreement - cuts  against  the voluntariness of their act and militates against granting a downward departure. However, we see no need to draw a bright line rule that limits departures based on extraordinary restitution to those defendants who paid restitution before indictment and not pursuant to a plea agreement." Id. At 1245.*

In *U.S. v. Paul*, 561 F. 3d 970 (9th Cir.  2009), where defendant Paul was convicted of embezzlement yielding an advisory guideline range of 10-16 months and the court imposed a original guideline sentence of 16 months and a subsequent sentence of 15 after the mandate, the

---

[7] The Office of Inspector General of the United States Department of Justice has published a Review of the Debt Collection of the United States Attorneys' Offices, which found there was $101.5 billion in outstanding criminal debt FYE 2014, and that only approximately 8% of criminal debt is collectable.  See Office of the Inspector General, Review of the Debt Collection Program of the United States Attorneys' Offices at 13 (June 2015), available at https://oig.justice.gov/reports/2015/e1506.pdf.  Because Mark Fisher has agreed to pay both restitution and forfeiture in this case, and he has further agreed to make an immediate $6 million payment in this case, this  will be among the 8% that is collected, and the Government will not be required to pursue further litigation in this case.

Court held that the a guideline sentence of 15 months was still unreasonably high in part because defendant Paul made full restitution.  See also, *U.S. v. Garlich*, 951 F. 2d 161, 163 (8th Cir. 1991) (district court erred in failing to exercise its discretion to determine if defendant who turned over assets of $1.4 million to cover loss of $253,000 merited departure for extraordinary restitution); *U.S. v. Miller*, 991 F. 2d 552, 553-554 (9th Cir. 1993) (remand for district court to determine whether $58,000 repaid for $45,000 embezzled constituted atypical restitution); *U.S. v. DeMonte,* 25 F. 3d 343, 346 (6th Cir. 1994) ("we have acknowledged that restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure"); *U.S. v. Bean*, 18 F. 3d 1367, 1369 (7th Cir. 1994) ("undoubtedly there are circumstances that would justify using § 5K2.0 to [depart downward on the basis of restitution] beyond [the] two levels [of reduction provided by § 3E1.1].); *U.S. v. Oligmueller*, 198 F. 3d 669, 672 (8th Cir. 1999) (affirming district court's downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution").

Again, as we are in a post-booker arena, it is respectfully requested that this Court find that Mark has exhibited extraordinary acceptance of responsibility and consider this factor when evaluating the §3553 factors for a potential variance from the advisory guidelines.

<u>Cooperation with the Government</u>

Consistent with Mark's acceptance of responsibility, he has provided extensive cooperation to the government.  Undersigned counsel will illustrate the nature of the cooperation to the Court at the time of sentencing.

Although it is not anticipated that the government will file a motion to reduce sentence pursuant to Rule 5K1.1 at this juncture, this Court may consider Mark' s cooperation efforts to date in fashioning a below-guideline sentence in this case.   Post *Booker*, the government conceded in *U.S. v. Fernandez*, 443 F. 3d 19, 33 (2nd Cir.  2006)  and appellate courts around the country have held, that the sentencing judge may consider a defendant's cooperation as one factor bearing on a proper sentence, even if the government did not make a "departure" motion, *U.S. v. Barner*, 572 F. 3d 1239 (11th Cir.  2009).  Therefore, this Court, pursuant to 18 U.S.C. § 3553, may apply any weight to Mark's cooperation efforts in fashioning a below-guidelines sentence in this case.

In support of this issue, this Court should consider the following cases: *United States v. Knox*, 573 F. 3d 441 (7th Cir.  2009) (we agree with Davis that, as a general matter, a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if the government has not made a  § 5K1.1 motion); *United States v. Fernandez*, 443 F. 19, 33 (2nd Cir.  2006) (reasoning that a district court should consider "the contention that a defendant made efforts to cooperate even if those efforts did not yield a government motion for a downward departure pursuant to U.S.S.G. § 5K1.1"); *United States v. Doe*, 398 F. 3d 1254, 1260-61 (10th Cir.  2005) (concluding that "a defendant's assistance should be fully considered by the district court at sentencing even if that assistance is not presented to a court in the form of a § 5K1.1 motion"); and *United States v. Khoury*, 62 F. 3d 1138 (9th Cir.  1995) (the Court may depart downward where the government refuses to make a § 5K1.1 motion because the defendant went to trial even though government initially offered to do so, and where defendant's

cooperation led to the arrest of a co-defendant).  It is respectfully requested that Mark's significant cooperation efforts be taken into consideration in fashioning a below-guidelines sentence in his case.

<u>Charity and Community Involvement</u>

In *United States v. Adelson*, 441 F. Supp 506,511 (SDNY 2006), Judge Jed Rakoff, explained the importance of a defendant's good work and the support of his community that he receives at sentencing stating:

"*But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  The elementary principle of weighing the good with the bad, which is  basic to all great religions, moral philosophies, and systems of justice, was plainly part of Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."*

Mark Fisher has served the communities he has lived in for the past 25 years. He has provided pro-bono legal services, he has worked with children, the elderly, and those less fortunate.  Mark has also involved his wife and children in his charitable work which he has been involved in year after year.

• Between 1993 and December 1995, Mark was a volunteer and member of Sixty Plus, Inc., Elderlaw Clinic.  The Sixty Plus clinical experience allows law students to interview, counsel, represent and advocate for clients, age 60 and older.  Interns were closely supervised by clinical faculty and performed a variety of legal functions, including but not limited to:

drafting pleadings, arguing motions, negotiating with opposing counsel and conducting trials under Michigan Student Practice Rule 8.120;

• During the same period, Mark became a member of Michigan Guardian Ad Litem Program and advocated for the elderly who were living in assisted living facilities under terrible conditions without family support;

• Between 1996 and 1998, in Tampa before he was a member of the Florida Bar, Mark regularly volunteered his legal services at Bay Area Legal Services and provided legal assistance to the poor several evenings each month at the George Edgecomb Courthouse;

• Mark was also a volunteer at the Guardian Ad Litem Program in Tampa;

• Mark volunteered at the Hillsborough County Bar Association Young Lawyers Division;

• Beginning in 2002, for approximately 4 years, Mark assisted and provided pro bono administration and civil litigation case work while a sole practitioner to a family with a severely autistic child.  The litigation surrounded Wachovia Bank's failure to apply several payments and future payments so the family could refinance a VA loan.  The case proceeded through discovery, mediation and ultimately settled at trial;

• Between 2011 and 2017, Mark coached SABR soccer, ages five and six boys and ages three, four and five girls.  He also coached and managed baseball (t-ball through little league) in Delray Beach and a boys soccer team in Boca Raton.

• Since 2010, Mark has been a member of several local synagogues (Temple B'nai Torah, B'nai Israel, and The Neshamah Institute) and has participated in the following community

service projects along with his wife and children:

> * The Soldier Project, preparing care packages for U.S. soldiers in Iraq and Afghanistan;
>
> * Picking vegetables for the needy in Delray Beach.
>
> * Painting houses for Habitat for Humanity.
>
> *Volunteering time with the mentally challenged at Puzzle House in Coconut

Creek, and with the elderly at Delray Beach and Boynton Beach homes, as well with area Holocaust survivors.

In *U.S. v. Cooper*, 394 F. 3d 172 (3rd Cir.  2005), a securities and tax evasion case with a sentencing range of 15 to 21 months, a four-level downward departure  and a sentence of probation was warranted for a defendant's "exceptional" good works who did not simply donate money to charity but also organized and ran youth football team in a depressed area, mentored its members, and helped several members attend better high schools or go to college, which qualified as exceptional because they entail "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."

Mark's history of community service and charitable deeds should be considered by the Court in fashioning a below-guidelines sentence in this case.

<u>Age and Health</u>

Mark Fisher at the age of 54 with serious health problems has a significantly lower risk of recidivism than most offenders.[8]  Effective November 1, 2011, § 5H1.1 was amended to state

---

[8] Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004)   www.ussc.gov/punlicat/Recidivism_General.pdf. ("Recidivism

that age "may be relevant" as to whether a downward departure should be granted.  Under the *advisory* guidelines, age is not "ordinarily" relevant under § 5H1.1, but may be in unusual cases or in combination with other § 3553 factors.  In *United States v. Gray*, 453 F. 3d 1323 (11th Cir. 2006), a child pornography case, the low end of the guidelines was 151 months and the district court's sentence of 72 months was deemed reasonable because the defendant was 64 years old with medical problems.  See also *United States v. Hildebrand*, 152 F. 3d 756 (8th Cir.  1998), in which a departure from 51 to 63 months to probation and six months home detention was affirmed because defendant was 70 years old with medical problems, and *United States v. Carter*, 538 F. 3d 784 (7th Cir.  2008), in which the guideline range was 87 to 108 months and the court affirmed a 24-month sentence, in part, because the defendant was 61 years old and age is relevant to the risk of recidivism and "the likelihood of recidivism is a proper sentencing consideration".  The Court further stated that "Indeed, we have held specifically that a district court may properly consider a defendant's age as it relates to the possibility of her committing crimes in the future.

The "Silver Tsunami" and Sentencing - Age and Health as Mitigating Factors, by Evan A. Jenness and published in the September/October 2013 Champion, discusses the issue of elderly and infirmed inmates.  What is "old" when it comes to sentencing a defendant to prison is not the equivalent of "old" in the outside world.  The median age of a  federal defendant at sentencing is 34.[9]  The National Institute of Corrections defines prisoners 50 and older as

rates decline relatively consistently as age increases," from 35.5% under age 21 to 9.5% over 50.)

[9] Sourcebook, Table 6

"elderly" and "aging",[10] and 15 states specifically define an "older" inmate as 50 or older.[11] Only 10.8 % of all federal defendants are over 50.[12]  Mark Fisher is 54 years old.

A significant contributing factor to Mark's medical conditions is the 2 serious auto accidents he was involved in.  The first accident in 2003 permanently damaged Mark's cervical spine at C3 and C4 and caused the onset of Temporomandibular Joint (TMJ) Disorder. The second more severe accident on April 14, 2017, resulted in further trauma to Mark's cervical spine as well as a severe concussion resulting in a multitude of neurological issues.  A report from the Spine Institute of South Florida, dated 13 days after the accident, confirms an MRI of the cervical spine on April 20, 2017 showing a central disc herniation at C3-C4 causing a moderate degree of bilateral foraminal stenosis.  The report also notes a moderate to severe degree of bilateral foraminal stenosis at C4-C5, C5-C6, and C6-C7.  Based on the above-mentioned diagnosis, it has been recommended that Mark have cervical spine surgery at C3 to C6 to alleviate the pain, numbness to his head and down his left arm to his hand, problems with his right clavicle, blurred vision, auditory problems, fatigue, and migraine headaches. Physical therapy has not provided any noticeable relief to date.

In addition to his physical ailments, Mark has experienced depression most of his adult life.  It has been especially acute since the 2017 auto accident and has been further exacerbated by his current legal problems. Dr. Phil Heller, Psy. D. noted in his report on January 5, 2018:

*"Following the crash, Mark was found to be unconscious, then in and out of consciousness.  He was taken to the Emergency Room but cannot forget the bewildered look of intoxication on the*

---

[10]Dr. Joann B. Morton, An Administrative Review of the Older Inmate, USDOJ, National Institute of Corrections, 4 (1992)
[11] Old Behind Bars, at 17
[12] Sourcebook, Table 6

other driver. Since that time, Mark continues to have recurrent recollections of the accident.  He has a heightened sense of vulnerability when he is on the road, anticipating another accident at any time.  He does not like that feeling of loss of control and does not like driving.  The heightened vulnerability frightens him so that he experiences panic attacks and fears another accident is happening, perhaps two times a week. Within a reasonable degree of psychological probability, it is unlikely that Mark will return to his premorbid levels of functioning.  He was a practicing attorney for over 20 years and a family man actively involved in his community.  Now he is depressed and anxious with sequelae of a head injury. As he receives familial support and intervention, he may come to realize more of his intellectual and social potential, but not to the extent of clarity and efficiency that he enjoyed prior to the accident of April 14, 2017."

After evaluating Mark on April 2, 2019, Dr. Michael Brannon, Psy.D. reported:

In regard to the probability of recidivism, the examinee displayed several factors associated with a low risk of reoffending as follows: lack of anti-social personality traits, social support from family and friends, no prior legal history, amenability for treatment changes in cognitive functioning secondary to a recent head injury, and no active substance abuse.[13]

Based on the aforementioned facts and circumstances and statistical information, it is respectfully urged that the Court consider Mark's age in conjunction with his infirmities and their affect on lowering his potential for recidivism in fashioning a sentence below the advisory guidelines.

**REQUEST FOR RDAP**

Mark Fisher and  his brothers began abusing drugs as teenagers.  During Mark's college days, his addiction to drugs and alcohol progressed resulting in him voluntarily attending AA and NA meetings and dealing with multiple relapses.  After being prescribed pain pills after his first auto accident, Mark began abusing alcohol and pills.  Since 2012, and during the time of the offense Mark drank excessively, often drinking himself to sleep.  Mark struggles to maintain sobriety to this day.   Based upon his history of addiction, Mark is a prime candidate for RDAP.

---

[13] Dr. Brannon's report will be filed under seal with the Clerk of the Court and a courtesy copy provided to the government.

**CONCLUSION**

Mark Fisher will stand before the Court on May 10th humbled, humiliated and remorseful.  He has made every effort to right the wrong he has committed by cooperating with the Office United States Attorney, the FBI, and the SEC.  Mark's age and infirmities, the fact that he has relinquished his licenses to practice law, consented with the SEC to not participate in any public offerings, and the fact that he will be labeled a convicted felon all significantly reduce his risk of recidivism and militate against the need to impose a lengthy prison sentence.

Based upon the facts and circumstances set forth in this filing, a sentence below the advisory guidelines will be sufficient but not greater than necessary to reflect seriousness of the offense, promote respect for the law and provide just punishment.

WHEREFORE, Mark Fisher respectfully requests that the Court: 1) impose a sentence below the *advisory* guideline range;  (2) recommend to the Bureau of Prisons  that  he participate in the RDAP program; and (3) be designated to a facility as close to his family in South Florida.

Respectfully submitted,

/s/ *Jason W. Kreiss*
JASON W. KREISS, ESQ.
Florida Bar Number: 87912
Counsel for Mark Fisher

The Kreiss Law Firm
1824 SE 4th Avenue
Fort Lauderdale, Florida 33316
Tel: 954-525-1971
Fax: 954-525-1978
Email: jwk@kreisslaw.com

20

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion has been

furnished by CM/ ECF to all counsel of record on this 5th day of May 2019.

/s/ *Jason W. Kreiss*
JASON W. KREISS, ESQ.